UNITED STATES of America,
Plaintiff-Appellee,

v.

William Peter KAMPILES,
Defendant-Appellant.

No. 78–2646.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1979.

Decided Nov. 15, 1979.

Rehearing and Rehearing En Banc
Denied Jan. 24, 1980.

Michael D. Monico, Marvin Bloom, Chicago, Ill., for defendant-appellant.

David T. Ready, U. S. Atty., South Bend, Ind., George G. Matava, David R. Homer, on the brief), Dept. of Justice, Internal Security Sec., Criminal Div., Washington, D. C., for plaintiff-appellee.

Before CUMMINGS, PELL and TONE, Circuit Judges.

CUMMINGS, Circuit Judge.

In August 1978, a six-count indictment was returned against defendant. Count I charged him with delivering the cover page, table of contents and section 1 of Copy No. 155 of a 1976 "KH–11 System Technical Manual" to a representative of the Soviet Union in Athens, Greece, on February 23, 1978, in violation of 18 U.S.C. § 794(a).[1]

---

1. 18 U.S.C. § 794(a) provides as follows:
 "(a) Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or

Count II charged him with delivering sections 2 through 8 of that document to a Soviet representative in Athens on March 2, 1978, in violation of the same provision.

Count III charged defendant with having unauthorized possession of the cover page, table of contents and section 1 of said document relating to the national defense and willfully delivering it to a person not entitled to receive it, again in Athens on February 23, in violation of 18 U.S.C. § 793(e).[2] Count IV charged him with the same kind of violation on March 2 with respect to sections 2 through 8 of that document.

Count V charged defendant with the unauthorized sale of the title page, table of contents and section 1 of the document on February 23 in violation of 18 U.S.C. § 641.[3] Count VI charged him with the same type of offense on March 2 with respect to sections 2 through 8 of the document.

At his arraignment, defendant pled not guilty to the indictment. However, after an eight-day jury trial in which he testified on his own behalf, he was convicted on all counts. He was sentenced to concurrent 40-year terms of imprisonment on Counts I and II and concurrent ten-year terms on Counts III through VI to run concurrently with the sentence under Count I. We affirm.

## I. Sufficiency of the Evidence

The charges in this case stem from four meetings that defendant William Kampiles had with Michael Zavali,[4] a Soviet intelligence agent, in Athens, Greece, in February and March 1978. The defendant maintained at trial that during these meetings he "played a game" with Zavali, successfully persuading the Soviet agent through his conversation and the passing of harmless material that he worked for our Central Intelligence Agency (CIA) and would be interested in working as a double agent. The Government alleged, and the jury ap-

transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life."

2. 18 U.S.C. § 793(e) provides as follows:

"(e) Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it * * *.

\* \* \* \* \* \*

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

3. 18 U.S.C. § 641 provides as follows:

"Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

"Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"The word 'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater."

4. Defendant's brief reports the Soviet's name as Zavoli while the Government refers to him as Zavali. For the sake of convenience we adopt the Government's spelling.

parently agreed, that Kampiles succeeded in gaining the trust of the Soviet agent only by passing to Zavali Copy 155 of the KH–11 System Technical Manual, which involves top secret material concerning United States satellite photography programs.

■ Central to the Government's case was a confession given by Kampiles during interviews in August 1978 with representatives of the CIA and Federal Bureau of Investigation (FBI). In his confession, Kampiles admitted receiving $3,000 from Zavali in return for the KH–11 manual. On appeal, defendant emphasizes the importance of the confession to the Government's case and urges that the evidence was insufficient to find him guilty because an accused may not be convicted upon his uncorroborated confession. *Smith v. United States*, 348 U.S. 147, 152–153, 75 S.Ct. 194, 99 L.Ed. 192. The Supreme Court has ruled, however, that "the corroborative evidence need not be sufficient, independent of the statements [here the confession], to establish the *corpus delicti*." *Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101. The corroboration is adequate if it "supports the essential facts admitted sufficiently to justify a jury inference of their truth." Under these principles, defendant's argument has little force since the question primarily at issue here is not whether the meetings in fact took place, but rather what transpired at those meetings. As is clear from the *Opper* case itself, no independent evidence of the specific events transpiring at those meetings is necessary for the conviction to stand. Nevertheless, we shall review the evidence in this case in order to illuminate this issue and other issues presented on appeal.

■ It is undisputed that defendant had been employed by the CIA from March 1977 to November 1977. The meetings in question occurred during a vacation taken by defendant in Greece shortly after his resignation from the CIA. Apart from his confession, Kampiles himself provided two accounts of the circumstances surrounding his encounters with Zavali and the events occurring at the meetings, accounts he also

endorsed at trial. The first of these accounts appears in a letter defendant wrote in late May or early June 1978 to George Joannides, a more senior employee whom Kampiles knew at the CIA, describing his encounters with Zavali. In the letter, which was received in evidence at trial, defendant told Joannides that in late February 1978 he had unwittingly entered a party at the Soviet Embassy in Athens and had met an individual describing himself as "Michael." Kampiles said he told Michael he was an employee of our government. According to the letter, Kampiles convinced Michael at later meetings that he still worked for the CIA and, in response to Michael's promise of "a great deal of money," that he would be willing to bring sensitive documents to the Russian. Michael told defendant the information he wanted and they discussed using a camera for obtaining it. Kampiles also wrote that before he left Greece he and Michael set another meeting for the latter part of August 1978, and Michael gave defendant his name and address, which defendant enclosed with the letter to Joannides. The enclosure showed the Russian's name as Mr. Z. Michalis, with an Athens address.

Joannides testified that he turned this letter and enclosure over to the Soviet section of the CIA and at the request of that agency telephoned defendant to come to Washington, D.C., at CIA expense for an August 14 interview. At that interview, during which Kampiles was questioned by two employees of the CIA and two FBI agents, the defendant provided a second expanded version of the meetings with Zavali. Defendant told the agents that he knew that Michael was a Soviet intelligence officer and had met him four times. Defendant also said he told Michael he would work for the Soviets by furnishing information to him for $10,000 plus expenses per each trip to Greece. He gave the Soviet agent an identification card he had obtained while employed by the CIA. At his final meeting with Michael, the Soviet agent gave defendant $3,000 "for general expenses" and stated that his superiors had

approved defendant's financial request for future trips, which were to occur twice a year. According to Kampiles' statements during the interview, Michael asked defendant to obtain top secret information about long- and short-range missiles, the B–1 bomber, cruise missiles and the identities of CIA agents abroad, and advised Kampiles to purchase a 35 mm. camera to photograph the relevant documents. Michael gave defendant an accommodation address through which Kampiles could advise Michael of impending trips to Greece, and the two agreed upon a signal site[5] and a place to meet upon Kampiles' arrival in Greece.

Defendant told the four persons interviewing him that he returned to the United States on March 5, the day after his last meeting with Michael, and deposited the $3,000 in a savings account. He said he contacted Michael through the accommodation address in August 1978, telling Michael he would be traveling to Greece during that month. He said he intended to tell Michael that he had been undergoing training for a new position at the CIA and that he had only limited access to documents of interest to the Soviets.

Other evidence at trial showed that toward the end of the interview, one of the FBI agents insisted that defendant must have given Michael a document in return for the $3,000, but defendant declined to change his story. This same agent then offered Kampiles an opportunity to be re-interviewed the following day, an offer defendant accepted.[6] On August 15, defendant was interviewed by a third FBI agent, James Murphy. During this interview, when Murphy insisted that Kampiles tell the truth, Kampiles admitted to Murphy that he had sold the KH–11 manual mentioned in the indictment to the Soviet agent in Athens. He subsequently made the same admissions to the FBI agents who had interviewed him the previous day and ultimately gave a complete confession.

Since defense counsel does not challenge the contents of the confession, which was admitted in evidence, there is no need to recount its details here except to state that it fully supports the six counts of the indictment. In addition to defendant's own account of the Athens meetings, the independent evidence adduced at trial to corroborate the confession is clearly sufficient to satisfy the *Opper* rule. The Government showed that defendant began work for the CIA in March 1977 as a watch officer in that agency's Operations Center Watch Office in Langley, Virginia. A watch officer's duties were to monitor and digest incoming reports from around the world. Prosecution testimony established that Copy 155 of the KH–11 manual, then and now classified as "Top Secret," was in a file near defendant's work station and was available for his use. The manual describes the KH–11 satellite system of advanced photography for gathering intelligence on areas of interest to this country's national defense. According to a government witness, a search of the CIA Watch Office after defendant confessed to its sale to Michael failed to produce Copy 155.[7]

Through airline tickets, defendant's passport, and a stipulation, the Government proved that defendant had traveled to Athens on February 19, 1978, and had returned to Chicago on March 5, in accordance with his confession. In addition, the prosecution provided testimony and photographs to corroborate Kampiles' description of the Soviet

---

5. A signal site is a predetermined site at which a signal is given that a certain activity is about to take place. In this case, Kampiles was to place a tack on a telephone pole near the Athens stadium to indicate that he wished to meet Zavali.

6. As is discussed at greater length in Part IV of this opinion, the agent actually proposed that Kampiles be re-interviewed while being tested by a polygraph machine. The defendant agreed to this procedure. It is only after he failed the polygraph test while retelling his story the next day that he confessed to passing the KH–11 manual.

7. One defense witness testified at trial that she recalled seeing a KH–11 "document" in the Watch Office in December 1977 after the defendant had left the employ of the Agency. She admitted, however, that the document she saw resembled the KH–11 *handbook*, a document similar to but different from the missing copy of the manual described in the indictment.

Embassy in Athens. Photographs and testimony also showed that the "Michael" in defendant's confession was Michael Zavali, the Soviet military attaché in its Athens Embassy. Other evidence indicated that the meeting sites described by the defendant included Constitution Square, the National Gardens, Sorrento's Pizzeria, and the signal site near the Athens stadium.

A counter-intelligence officer, certified by the court as an expert, testified for the Government that agreement on an accommodation address, a signal site, and a meeting place, as described by the defendant in all accounts of the Athens meetings, were signs that Kampiles had been recruited by a foreign intelligence service after establishing his credibility by passing classified information. The same witness stated that the Soviet intelligence service would never pay an individual $3,000 without first receiving classified material. Finally, the records of defendant's savings account at the First Savings and Trust Bank of Hegewisch, Illinois, corroborate defendant's admission that he received $3,000 from Michael.

As already indicated, it is well established that proof corroborating a confession need not be sufficient to establish the *corpus delicti* (*United States v. Pichany*, 490 F.2d 1073, 1076 (7th Cir. 1973)), and the confession itself may supply whatever elements of the offense are not proved by independent evidence, *Scarbeck v. United States*, 115 U.S.App.D.C. 135, 155, 317 F.2d 546, 566 (D.C. Cir. 1962), certiorari denied, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077. The foregoing evidence is sufficient to establish the truth, trustworthiness, and reliability of the defendant's confession, and, together with the confession and other admissions, it covers all of the elements of the charged offenses. The evidence is therefore sufficient to sustain defendant's conviction.

## II. Venue

Defendant argues that the Government failed to establish that venue was proper in this case, so that defendant's motion for acquittal at the close of the Government's case should have been granted. We disagree.

 The Criminal Code provides that where, as here, alleged offenses are committed outside the jurisdiction of any particular state or district, venue shall be where the defendant "is arrested or is first brought." 18 U.S.C. § 3238. Although it is well established that proof of venue is an essential part of the Government's case (*United States v. Budge*, 359 F.2d 732, 734 (7th Cir. 1966)), in the seminal case of *United States v. Jones*, 174 F.2d 746 (7th Cir. 1949), we stated that proof of venue will be sufficient "[i]f, upon the whole evidence, it may reasonably be inferred" that venue is proper. See also *United States v. Budge, supra*, at 734; *United States v. Graves*, 428 F.2d 196, 201 (5th Cir. 1970), certiorari denied, 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269; 1 Wright, Federal Practice & Procedure § 307. Here such an inference was clearly warranted. Since the defendant's own testimony established that he was arrested in Munster, Indiana, it was proper to try the defendant in the Northern District of Indiana, where Munster is located.

 This approach to proof of venue is consistent with the general requirements of proof. In *United States v. Fearn*, 589 F.2d 1316 (7th Cir. 1978), we noted that if, as here, a defendant does not stand on his motion for acquittal but introduces evidence in defense, the court of appeals can examine the evidence as a whole, including that offered by the defendant.[8] We adhered to this approach in *Fearn* although the question there was whether the defendant had been proved guilty beyond a rea-

---

8. *Fearn* reflects the long-standing rule that by introducing evidence on his own behalf a defendant waives any error in the trial judge's denial of a motion for acquittal at the close of the Government's case. *United States v. Calderon*, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202. A defendant may, of course, stand on the origi-

nal motion, thereby restricting consideration to the evidence adduced by the Government. The availability of this option constitutes a sufficient response to the assertion by defendant's counsel at oral argument that the *Fearn* case would eviscerate Rule 29(a) of the Federal Rules of Criminal Procedure.

sonable doubt. Such an approach is *a fortiori* proper when the issue is proof of venue since venue need be proved only by a preponderance of the evidence. *United States v. Lisowski*, 504 F.2d 1268, 1273 (7th Cir. 1974).

Allowing proof of venue upon the whole evidence also comports with sound policy. As Judge Pell rightly noted in *United States v. McDonough*, 603 F.2d 19, 22 (7th Cir. 1979), failure to show whether an offense was committed in the trial district "will frequently be the result of inadvertence or neglect." Since, as he explained, gamesmanship should not be permitted to compromise a trial's fundamental purpose of determining the merits of the charges, a trial judge would be well advised, in the absence of any showing of prejudice to the defendant, to reopen the Government's case to admit proof of venue. Similar policies support Judge McNagny's decision to consider the defendant's own evidence in reviewing the venue question, particularly since defendant offered nothing to indicate how he was prejudiced by that decision.

### III. *Adequacy of Trial Court's Handling of Pre-trial Publicity*

■ Defendant asserts that his due process right to receive a fair trial by an impartial jury was violated because of a "tremendous amount of adverse publicity" before the start of his trial (Br. 29). Specifically, he calls our attention to ten local newspaper articles and a television interview with CIA Director Stansfield Turner. Eight of the newspaper articles, however, appeared in the Indiana *Hammond Times* between August 18 and September 6, long before the November 6 commencement of the trial. Although some of the prospective jurors apparently saw these local accounts,[9] the likelihood that the stories caused those jurors to have definite opinions at the time of trial is considerably diluted by the passage of time. Mere familiarity by jurors with the articles, meanwhile, is insufficient to

establish prejudice since "[i]t is not required . . . that jurors be totally ignorant of the facts and issues involved," especially given the presumption of juror impartiality that applies in all cases. *Irvin v. Dowd*, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751.

The remaining two articles, published only in Chicago newspapers, and the telecast did appear near the beginning of the actual proceedings. Each, moreover, treated the alleged loss of classified information to the Soviets as an established fact. But there is scant evidence that the 36 veniremen read these specific accounts or heard the telecast. Even if they had, it is reasonable to assume that the jurors were capable of laying aside whatever initial impressions they had formed about the passing of classified documents once they heard the trial judge's warnings regarding prejudice and saw how sharply the issue was mooted at trial. Neither the articles nor the telecast made any mention of Kampiles' confession, his failure of the polygraph examination or any other evidence that might have irretrievably prejudiced the defendant. Therefore the district judge reasonably found that "[t]here has not been a lot of adverse publicity as far as the defendant is concerned" (Tr. 19).

Since the form of questioning jurors at voir dire logically depends on the extent of pre-trial publicity, the court's aforesaid finding on the publicity issue suggests that no extraordinary voir dire procedures were necessary. Nevertheless, Judge McNagny's questioning at voir dire reflected a proper concern about the publicity the defendant had called to his attention and about the need to elicit sufficient information from the veniremen for defendant to use his preemptory challenges intelligently. Examining the 36 veniremen in three separate groups, Judge McNagny carefully queried the prospective jurors on whether they had previously heard or read about the case. When 21 of the jurors indicated they had

---

9. The transcript also indicates that the jurors were familiar with several other articles appearing in local newspapers that discussed the

case (Tr. 46, 47, 72, 99). Defendant has not alleged that these articles resulted in any juror prejudice.

seen something about the case, he questioned each individually about his past exposure, though he did so in front of the other jurors. Defendant challenges both the form of the questions the district judge asked and his decision not to question each prospective juror outside the presence of the others. Although some of Judge McNagny's questions were somewhat suggestive, apparently the result of his zeal for impressing upon the prospective jurors a need for impartiality, they always followed more direct and specific questions about the opinions jurors had formed. Notwithstanding defendant's assertion that the judge found prejudice on the one occasion he asked a direct question, there were numerous instances in which Judge McNagny questioned the jurors in an objective manner and elicited clear negative responses about possible prejudice (Tr. 8–11, 41–44, 73–74).[10] Indeed, the occasions on which jurors acknowledged their prejudices[11] suggest both that the jurors were willing to admit openly to their predispositions and that the questioning did in fact disclose prejudice where it existed. Judge McNagny also carefully instructed the jury at voir dire on the presumption of innocence and the burden placed on the Government in proving its case (Tr. 15, 49, 76).

On this record, it was not mandatory to question each prospective juror individually out of the presence of the other veniremen. We have declined to insist upon individual examination of jurors in all cases in which the pre-trial publicity issue arises. *Margoles v. United States*, 407 F.2d 727, 732 (7th Cir. 1969). We have noted, moreover, that individual interrogation is often not a superior guarantee of impartiality, especially when, as here, the jurors do not seem particularly inhibited by the presence of the other veniremen. *Margoles v. United States, supra*, at 732. Since the trial judge properly found that the level of adverse publicity was not high and the questioning of the veniremen had the desired effect, there was no error in the voir dire procedure. *United States v. Carter*, 602 F.2d 799, 803 (7th Cir. 1979); *Margoles v. United States, supra*, at 732.

Defendant also complains that the trial judge failed to ask the questions defendant proposed for voir dire. Before the voir dire examination commenced, defense counsel asked the judge to put five specific questions to the prospective jurors. The first four were covered in questions asked by Judge McNagny, and in view of all the

**10.** For example, the judge had the following colloquy with one of the prospective jurors from the first group of veniremen (Tr. 9–10):

> The Court: Mr. Baum, I believe you had your hand up, is that correct sir?
> Juror Baum: Yes, sir.
> The Court: Did you read about it in the newspaper, or did you hear about it on the radio or TV?
> Juror Baum: Yes, sir, the newspaper, yesterday.
> The Court: Do you have any fixed opinion about the matter, or would you also be willing to wait until you have heard all of the evidence?
> Juror Baum: I would wait.
> The Court: It is not so much that you are willing to wait, Mr. Baum, but the question is whether you have formed any opinion.
> Juror Baum: No, I haven't, your Honor, I just read it in the paper, and the football game came on.
> The Court: So you feel you could be fair and impartial, not only to the government, but also to the defendant, is that correct?
> Juror Baum: Yes, sir.

In examining the third group of veniremen, the following discussion occurred (Tr. 73–74):

> The Court: Mrs. Turczi, have you read or heard about the case?
> Juror Turczi: Yes.
> The Court: Where did you hear about it?
> Juror Turczi: The Hammond Times.
> The Court: Did you form an opinion as to the guilt or innocence of the defendant?
> Juror Turczi: No.
> The Court: Let me ask you, would you be willing to base your decision solely on the evidence introduced in the courtroom, and not otherwise?
> Juror Turczi: Yes.
> The Court: Is there any doubt in your mind?
> Juror Turczi: No.

To be sure, the court did not always employ this same line of questioning. As is proper, the court assessed the responses of the prospective jurors and tailored his questions to the circumstances present for each individual juror.

**11.** These included one instance during the questioning of the regular jurors (Tr. 69) and one instance, not cited by defendant, during the questioning of the alternates (Tr. 96).

other questions put to the jurors, he cannot be faulted for not asking the fifth.[12]

█ Finally, although the defendant insists that the jurors should have been sequestered throughout the trial, the district court's repeated instructions to the jurors provided an adequate safeguard against prejudicial publicity. Since defendant has not demonstrated that the failure to sequester the jurors prejudiced him, no abuse of discretion has been shown. *United States v. Carter, supra,* at 805.

## IV. District Court's Treatment of Defendant's Confession

### A. Defendant's Confession and Admissions Were Properly Admitted into Evidence

Defendant confessed to three FBI agents on August 15, one day after he had met with two of the agents and two CIA employees to tell them his exculpatory story. On August 16, during another meeting with the FBI agents, defendant made additional incriminating admissions. Defendant moved to exclude his statements and admissions made during the meetings on all three days, arguing that they were involuntary and that defendant failed to receive the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. After considering the arguments at length, Judge McNagny issued a 13-page order permitting introduction of the statements. Defendant has renewed his voluntariness and *Miranda* arguments here, but a brief review of the relevant evidence will illustrate that Judge McNagny decided this issue correctly.

As Judge McNagny found, defendant initiated the discussions with the CIA in May 1978, when he contacted CIA employee George Joannides and volunteered a de-

scription of his February-March meetings with Soviet agent Zavali in Athens. Defendant subsequently repeated the story in a letter he sent to Joannides in late May or early June 1978, stating in addition his willingness to "discuss this experience in full detail." It is the letter that prompted defendant to be invited to Washington at government expense to be debriefed in mid-August.

The August 14 discussions took place in an Alexandria, Virginia, motel room beginning around 10:45 a. m. after defendant was picked up at his own motel. Not only was the meeting conversational rather than interrogational, but, according to the testimony of government witnesses at the suppression hearing, defendant was relaxed, cooperative, and agreeable. He told his story openly. To be sure, the defendant quickly became a suspect in the ongoing investigation into the KH–11 security breach. But defendant was almost immediately aware that the Government did not entirely believe his story, as he indicated to one of the CIA employees during an extended break for lunch. Furthermore, he was told during the afternoon session that he was suspected of having passed a document to a Soviet agent and he was asked whether he wished to change his account of the Athens meetings. Declining to do so, defendant did agree to take a polygraph examination the next day at the FBI Washington field office for the express purpose of resolving the question whether he had passed the document.

Defendant returned to his own Washington motel room about 6:00 p. m. on August 14. He was at this point neither placed under arrest nor subjected to any form of surveillance. Indeed, there is no evidence that he was ever detained against

---

12. The fifth question was (Br. 30):

"Assuming you were picked as a juror in this case and brought in a verdict of guilt or innocence, would your rendering of this verdict be of embarrassment to you or your spouse, at your job or in your neighborhood?"

Although it would have been appropriate to ask this question of the prospective jurors, the failure to do so was not erroneous in view of the completeness of the voir dire, which included many of defendant's proposed questions. *United States v. Harris,* 542 F.2d 1283, 1296–1297 (7th Cir. 1976), certiorari denied *sub nom. Clay v. United States,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779.

his will at any time during his stay in Washington, and the Government has stated that none of the agents who had contact with defendant during the August meetings had any authorization to arrest or detain him.

About 10:00 a. m. the next morning defendant arrived at the FBI Washington field office for the polygraph examination. He was then read the *Miranda* warnings and was given the customary interrogation waiver form as well as a polygraph consent form to sign. He stated at the time of signing that he understood the forms. He was told that he could leave the field office at any time and could ask any questions at any time. FBI Agent Murphy first reviewed for defendant and questions he intended to ask and then administered a 12-minute polygraph test, ending at 12:30 p. m.

After defendant returned from a reception area where he had gone for a soft drink, the FBI agent told defendant that he had been deceptive during his polygraph test. Defendant then agreed to take another polygraph examination, which yielded the same result. It was after being confronted with the results of this second examination that defendant confessed to having passed a document to a Soviet agent, a confession he repeated to two other FBI agents a few minutes later.

Defendant subsequently asked to take another polygraph examination and was told that he could do so the next day. He spent the night at an Arlington, Virginia, motel, where he was for the first time placed under surveillance by the FBI. The next morning defendant conferred at the Washington field office with the same FBI agents, but declined to discuss whether he had taken additional documents or had sold them to a Soviet representative. He did indicate, however, that he was willing to answer additional questions on other subjects. After being read a *Miranda* form such as he had signed on August 15, defendant was interviewed about his trip to Greece by the three FBI agents for two hours. Defendant then returned to Chicago, still not under arrest.

■ Relying on the foregoing evidence, the district judge concluded that the defendant was not entitled to *Miranda* warnings during the August 14 meeting and that his statements on that date were completely voluntary. We concur on both points. Since defendant initiated the meeting through his contact with Joannides, attended of his own free will, and was at liberty to come and go as he pleased, it is clear that the initial meeting was non-custodial. The *Miranda* warnings were thus unnecessary, (*Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714) regardless whether defendant had become the focus of the FBI investigation. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1. Furthermore, since defendant volunteered his story about the meetings with Zavali during an informal, conversational interview of reasonable duration, the "totality of circumstances" indicates that the defendant's statements were not coerced. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–226, 93 S.Ct. 2041, 36 L.Ed.2d 854.

■ Even assuming that the August 15 and 16 meetings were custodial in character, the district court correctly held that the defendant's rights also were not prejudiced during those encounters. The evidence is clear that the forms defendant signed apprised him of his *Miranda* rights. In addition, defendant stated at the time that he understood them, and the record shows that his manner and education suggest an ability to waive those rights knowingly and intelligently. As Judge McNagny properly found, given the circumstances of the meetings on those two days, defendant cannot sensibly have intended his waiver to apply solely to the brief period when he was actually subject to the polygraph examination.

There is also sufficient evidence to support the finding that defendant's statements and admissions of August 15 and 16 were made voluntarily. Defendant asserts that he confessed only after FBI Agent Murphy, who administered the polygraph examination, made several threats regarding defendant's family. Murphy denied making the threats. After examining the

parties and viewing the record as a whole, Judge McNagny found that any statements Murphy made were insufficient to demonstrate that defendant had lost control of the situation. Not only is such a finding based on credibility entitled to deference (*United States v. Buchanan*, 529 F.2d 1148, 1151 (7th Cir. 1975), certiorari denied, 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194), but there was considerable evidence that the August 15 and 16 meetings were not coercive in character. Defendant was familiar with the polygraph examination, having taken one upon originally joining the CIA. Throughout the interviews every effort was made to allow defendant "to have food and drink, and to attend to his bodily needs" (Nov. 14, 1978, order, p. 13). He confessed a second time to the other two FBI agents without being prompted by any alleged threats. He also made incriminating statements the following day after a night's rest, during which he was free to leave Washington if he so desired. Defendant exercised his independence at this meeting by personally setting the limits of the interview. When coupled with defendant's college education and mature demeanor, all this evidence precludes a finding of error in the admission of his incriminating statements into evidence.

**B. Withholding Evidence of the Polygraph Examination at Trial**

■ Regardless of the trial judge's finding on voluntariness, however, defendant was entitled to present the circumstances of his confession to the jury in an attempt to prove that it was coerced. 18 U.S.C. § 3501(a). He argues that the district court precluded him from making his defense by a ruling on the admissibility of the polygraph examinations. This ruling developed as follows: Before the trial started, defendant moved for an order *in limine* preventing the Government from mentioning that defendant had taken and failed his polygraph examinations. The district court granted the motion and prohibited either party from mentioning the polygraph tests, but specifically reserved final decision on the question for later reargument outside the presence of the jury.

Subsequently, on November 8, before adducing testimony from Agent Murphy and one of the CIA employees present during the August meetings, the Government requested Judge McNagny to hear further argument on the polygraph question. At a meeting in chambers, the Government stated that it wished to introduce evidence that the defendant had failed his polygraph tests, not to show that defendant was lying but merely as evidence bearing upon the voluntariness of his confession. It argued that under *Tyler v. United States*, 90 U.S. App.D.C. 2, 9, 193 F.2d 24, 31 (D.C. Cir. 1951), certiorari denied, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326, it was entitled to introduce evidence of the polygraph examinations for this limited purpose. In the face of this argument, defense counsel explicitly agreed that in return for a renewed ruling against the use of the polygraph, he would not attack defendant's confession for such reasons as, for example, the size and sound-proof character of the polygraph examination room and the length of the August 15 interview at the FBI office. Yet he was sufficiently anxious to avoid the jury's hearing that the defendant had undergone the polygraph examinations that he also told the district court he would not elicit evidence about "any of the points the government has problems with. We won't bring out any of that evidence. I submit to Your Honor, on oath we will not do that" (Tr. 243). The Government had previously indicated that it had "problems" with defense counsel's remark in his opening statement that he would introduce evidence that "threats against the defendant precipitated this confession" (Tr. 231). It argued that defendant should not be permitted to introduce such evidence while at the same time preventing the Government from mentioning the polygraph examinations that it believed caused the defendant to confess voluntarily. In this context, it is clear that defense counsel made a tactical decision that in return for keeping out any reference to the polygraph examinations, he would not offer evidence that the confession was involuntary.

Defendant argues that the agreement reached prior to Agent Murphy's testimony prevented examination solely of the physical conditions surrounding the polygraph tests. Yet at a brief conference at the bench, during the cross-examination of Agent Murphy himself, defense counsel acknowledged that he was not entitled to elicit direct testimony that Murphy had threatened defendant with regard to his relatives just before defendant confessed (Tr. 415, 416).[13] Later in the trial, Kampiles himself took the stand to give his account of the August 15 meeting. When defense counsel began to stray into the area involving Agent Murphy's alleged threats, the district judge called counsel to the bench to remind him of the earlier agreement. After registering a strenuous objection, defense counsel agreed to cease the line of questioning.

Defendant now complains that the district court's ruling regarding the polygraph examinations and the alleged threats violated defendant's Fifth and Sixth Amendment rights. In particular, he objects that the district court could not properly threaten to admit evidence of the polygraph, but was obligated to permit testimony regarding Agent Murphy's coercive statements. He asserts, moreover, that the district court unfairly surprised the defendant by extending without notice an agreement reached exclusively about the testimony of Agent Murphy to the defendant's own testimony.

The district court's treatment of this difficult matter was evenhanded. It would have been unfair to allow defendant to present his account of his admissions, based upon the alleged threats by Agent Murphy, without allowing the Government to demonstrate the extent to which failure of the polygraph precipitated the confession. The bargain struck was fair because it affected both parties through prohibitions running

to each side. Moreover, it left the ultimate decision to the defendant, and he deliberately chose to keep out references to both the polygraph and Agent Murphy's alleged statements. Defendant's objections can be successful only if the district court had no authority to admit evidence of the polygraph examinations in the first place and thus no authority to condition its exclusion upon defendant's continued silence regarding Agent Murphy's supposed statements.

For a variety of reasons, most Circuits, including ours, have been chary of admitting evidence of polygraph examinations. *United States v. Penick*, 496 F.2d 1105, 1109–1110 (7th Cir. 1974). Defendant would have us adopt a *per se* rule against the admissibility of such evidence because of its tendency to influence a jury improperly. This Court has persistently refused to adopt such a rule, choosing rather to leave the decision on admissibility to the sound discretion of the district court. *E. g., United States v. Bursten*, 560 F.2d 779, 785 (7th Cir. 1977). This Circuit has not previously encountered the situation presented here, where polygraph evidence is offered to show the circumstances of a confession rather than its truth and is intended to rebut charges of coercion. The probative value of the evidence in sustaining the specific point for which it was being offered here is substantial, and the party offering the evidence was not asserting the accuracy of the test results. Such limited use of polygraph evidence is precisely supported by *Tyler v. United States, supra*, which is still viable. *United States v. Bad Cob*, 560 F.2d 877, 882 n. 10 (8th Cir. 1977).

■ The district court's approach to the situation, looking as it did to all the equities involved, represented a sustainable exercise of its discretion. Judge McNagny had determined that the highly probative character of the polygraph evidence as to the

---

13. Judge McNagny also stated during the original discussion regarding Murphy's testimony that he was "going to put the defendant on notice, that if I feel they have overstepped their bounds with regard to attacking Special Agent Murphy or the manner in which the interview was conducted, I will then allow [evidence of the polygraph examinations] in, you might as well understand" (Tr. 244). From the start of the trial Judge McNagny thus included both testimony on the physical circumstances of the polygraph and the conduct of Agent Murphy in describing the territory forbidden to defense counsel.

voluntariness of the assailed confession sufficiently outweighed the prejudice to the defendant. Nevertheless, he chose provisionally to exclude the evidence, allowing defendant to decide whether to raise the issue. At least one other court has adopted a similar procedure, *State v. Green*, 271 Or. 153, 531 P.2d 245, 255 (1975).[14] It is worth noting that Judge McNagny did permit defense counsel in the cross-examination of Agent Murphy to ask in general terms whether he had told defendant that his mother might be in trouble for holding the $3,000 given defendant by the Russian agent, whether he mentioned that defendant's relatives in Greece might get into trouble because defendant had stayed with them or seen them, whether he had said anything about defendant's Greek police officer cousin, and whether he told defendant he might be able to go back to Greece to work for the CIA if he spoke truthfully (Tr. 413–414).[15]

The district court did not surprise defense counsel with an unexpected shift in the ground rules during Kampiles' own testimony. Defense counsel had explicitly agreed not to bring out evidence in the problem areas identified by the Government and was well aware of what those problem areas were. Logic also dictated that the district court's ruling should extend to Kampiles' testimony, for it would have been inconsistent and illogical to exclude the evidence during Murphy's testimony only to allow it in during the defendant's. In addition, with Kampiles still on the stand, the court adjourned for the day immediately after defense counsel learned unequivocally of the reach of Judge McNagny's ruling, thus allowing defense counsel considerable time to redraft his examination of the defendant and thereby diluting any possible prejudice. Because the handling of this matter was clear and accepted by counsel, it will not be disturbed on appeal.

## V. *Refusal of Continuance*

Defendant maintains that the trial court erred in denying his motion for a brief continuance on November 16, 1978, at the close of the evidence. The motion came shortly after defendant's counsel had completed the examination of Jacqueline Cooper, the final witness in the case, who had since June 1977 served as a watch officer in the same office where defendant had been employed. In her direct testimony, Miss Cooper stated that the senior watch officer, Christopher McCardy, had shown her a KH–11 "document" in that office in December 1977, some time after defendant had left the employ of the CIA (Tr. 1114–1116). Since, by the Government's own admission, Copy 155 was the only copy of the KH–11 manual ever filed in the Watch Office, Cooper's testimony tended to show that defendant could not have sold the Russians the material specified by the Government because the CIA still had the document in its possession after the defendant's departure from the Agency.

On cross-examination, however, Miss Cooper testified that although she was not positive, a KH–11 system *handbook*, shown to her by the prosecution, looked like the document she had seen. The handbook, which presented a simplified version of the KH–11 system, was a completely separate document from the manual. Following this testimony and brief re-direct examination, defense counsel read some exhibits into the record and then indicated he had nothing further to add to his case. After stating that "[t]he defense rests" (Tr. 1129), he withdrew that comment with the judge's permission pending a short recess for lunch.

After a break of an hour and a quarter, defendant asked Judge McNagny to reopen defendant's case to allow time for Anthony

---

**14.** In *Green*, defendant's choice was whether or not to contend that the polygraph examination itself or the technique of its administration was coercive whereas Kampiles' choice was whether or not to introduce evidence of supposedly coercive events contemporaneous with but independent of the examination.

**15.** In accordance with Judge McNagny's ruling, defense counsel asked these questions in a roundabout fashion and did not ask Murphy directly whether he had in fact threatened the defendant.

Lisanti, a court reporter from Chicago, to travel to the Hammond courthouse. Lisanti was to testify that on November 13, 1978, he had telephoned Christopher McCardy, who identified himself as having worked at the CIA Operations Center as a senior watch officer during 1977 and said he "did not recall ever seeing a KH–11 Handbook" there (Tr. 1134–1135). This testimony was offered to counterbalance witness Cooper's admission that the document she had seen looked like the KH–11 handbook rather than the KH–11 manual specified in the indictment. Judge McNagny indicated in response that he viewed the defense as having rested and that he was disinclined to delay the case to hear evidence that was merely collateral. When, in the ensuing discussion, the assistant prosecutor asserted that the testimony was hearsay, the trial judge denied the motion to reopen the case, overruling defense counsel's argument that the testimony was an admission by the servant of a party and thus within an exception to the hearsay rule.

■ On appeal, defendant contends that the district court's refusal to permit Lisanti to testify violated the Fifth and Sixth Amendments. To overcome the hearsay objection, defendant asserts that the statement by McCardy, a government employee, is well within the ambit of Rule 801(d)(2)(D) of the Federal Rules of Evidence and describes as "novel" the Government's argument that in a criminal prosecution government employees are not considered servants of a party-opponent for the purposes of the admissions rule. In truth it is defendant's

position that is novel. Prior to adoption of the Federal Rules of Evidence, admissions by government employees in criminal cases were viewed as outside the admissions exception to the hearsay rule. *United States v. Powers*, 467 F.2d 1089, 1095 (7th Cir. 1972). Because the agents of the Government are supposedly disinterested in the outcome of a trial and are traditionally unable to bind the sovereign (*United States v. Santos*, 372 F.2d 177, 180 (2d Cir. 1967)), their statements seem less the product of the adversary process and hence less appropriately described as admissions of a party. Nothing in the Federal Rules of Evidence suggests an intention to alter the traditional rule and defendant has cited no truly contrary case indicating such a trend.[16] Therefore, since Lisanti's testimony did not fall within any of the other exceptions to the hearsay rule, the district court correctly refused to reopen the case to hear it. *United States v. Keefer*, 464 F.2d 1385, 1387 (7th Cir. 1972), certiorari denied, 409 U.S. 983, 93 S.Ct. 322, 34 L.Ed.2d 247.

■ Even if the testimony were not hearsay, moreover, Judge McNagny's decision to deny the motion would not constitute an abuse of his discretion. See *United States v. Rothman*, 567 F.2d 744 (7th Cir. 1977). McCardy's statement that he "did not recall" seeing the handbook in the Watch Office, although relevant, was of low probative value. It did not show that the document Miss Cooper had seen was the KH–11 manual but was intended rather to leave that impression through an attenuated chain of inference.[17] The likely effect of

**16.** Defendant does cite *United States v. Morgan*, 189 U.S.App.D.C. 155, 160, 581 F.2d 933, 938 and n. 15 (D.C. Cir. 1978), in which the court did raise a question about the continuing viability of the rule in *Santos* and *Powers*. Yet *Morgan* was a case in which the Government had expressed its belief in the statement of the declarant under Rule 801(d)(2)(B), and the discussion of *Powers* and *Santos* is tentative and is clearly dicta. In addition, the *Morgan* court made an oblique reference to Rule 803(8), which excepts from the hearsay rule factual findings from law enforcement investigations to be introduced against the Government in criminal cases. It should be noted that this exception to the hearsay rule would be unnec-

essary if Rule 801(d)(2)(D) were found to encompass admissions by government employees.

**17.** McCardy's failure to recall the handbook perhaps suggested that he had not shown the handbook to Cooper. Yet such a conclusion did not necessarily show that Cooper was mistaken in saying she thought the handbook looked like the document McCardy had shown her in the Watch Office. Cooper had never testified that the document was in fact the handbook. Moreover, even if McCardy's testimony demonstrated that the document Cooper saw was not the handbook, it would still require a major step for the jury to conclude that the "document" was the manual, the apparent

the proposed testimony would be to cast doubt on Cooper's ability to recall what she saw in December 1977, and yet it was the defense that was relying on her memory to establish that the KH–11 manual remained in the Watch Office after Kampiles' departure from the CIA. Furthermore, the evidence in the record indicates that long before Cooper's admission during cross-examination that the "document" she saw resembled the handbook, defense counsel was apparently well apprised of the existence of the handbook, its contents, and its availability in the Watch Office. CIA employee Donoghue had testified on November 9, 1978, concerning the existence of the handbook and defense counsel had questioned him extensively about it during cross-examination (Tr. 506–507; 512–517). Court reporter Lisanti placed the transcribed call on November 13, 1978, three days before Cooper's testimony, and the record indicates no other matter Lisanti raised with McCardy during that conversation. Jacqueline Cooper testified, moreover, that during an earlier phone conversation with defense counsel she had described the object she saw at the Watch Office as a KH–11 "document" despite defense counsel's references to it as the "manual" (Tr. 1124–1125).[18] Notwithstanding this familiarity with the existence of the handbook and the ambiguity in Cooper's testimony, defense counsel made no effort to subpoena McCardy, did not make suitable arrangements for Lisanti to be ready to testify, and failed even to obtain his presence during the recess after Cooper's testimony. Coupled with the low probative value of the evidence, these factors fatally belie defendant's assertion that he was unconstitutionally deprived of his right to call witnesses in his own behalf or to have a fair trial.

purpose of Cooper's testimony in the first place.

18. Perhaps for this reason defense counsel in his direct examination of Cooper was himself careful never to describe the material in question as a manual rather than a document (Tr. 1115–1116; 1119).

## VI. Other Evidentiary Rulings

### A. Expert Testimony

 As noted earlier, the district court certified as an expert a counter-intelligence officer who testified for the Government on Soviet intelligence recruiting practices. Defendant vehemently objected to receiving the testimony of FBI Agent Sullivan as expert testimony,[19] and contends on appeal that the trial court's overruling of that objection constitutes reversible error. The seven pages of Sullivan's preliminary testimony, detailing his 11 years in Soviet counter-intelligence and participation in 100 cases involving the sale of government documents, unequivocally demonstrate his qualifications to testify about a subject sufficiently beyond the ken of laymen to warrant testimony by experts. Hence the trial court correctly applied Rule 104 of the Federal Rules of Evidence in certifying Agent Sullivan, and his opinion testimony was proper under Rule 702.

Defendant complains, in addition, that whatever the propriety of the expert testimony generally, defendant's inability to obtain an expert to rebut Sullivan's testimony made certification of an expert unfair in this case. Yet defendant's counsel did have available documentary evidence to challenge Sullivan's statements and engaged in an effective cross-examination of the opinions he expressed. The record also indicates that defendant had available several possible expert witnesses (Tr. 866–867). Clearly Judge McNagny's decision that Sullivan's expert testimony would assist the jury was not an abuse of discretion. *United States v. Cyphers*, 553 F.2d 1064, 1072 (7th Cir. 1977), certiorari denied, 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107.

19. It is worth noting that although defendant argues that Sullivan's testimony should have been excluded, defense counsel objected to only one of the questions put to this expert. That question was "Would you give us an example of the Soviet trade crafts?" After the objection was overruled, Sullivan gave a number of examples of how Soviet intelligence operates.

## B. *In Camera Ex Parte* Proceedings

The district court held two *in camera ex parte* proceedings at the urging of the prosecution. The first of these occurred on November 3, 1978, when, during the hearing on defendant's pre-trial motion to suppress his confession, defense counsel attempted to question government witnesses about the FBI investigation into the compromise of security on the KH–11 system. Specifically, defense counsel sought to establish whether Kampiles had been a target of the investigation before August 1978. Government counsel advised the court that allowing defense counsel to question CIA employee Bruce Solie on the origins of the prior investigation could precipitate disclosure of national security information. The Government had previously stipulated that defendant became the focus of the investigation on August 14, 1978, when he was interviewed by two CIA employees and two FBI agents.[20] The further testimony of government officials during the *ex parte* hearing in chambers persuaded Judge McNagny to sustain the Government's national security objections during the remainder of the hearing on the motion to suppress the confession.

The second *in camera ex parte* hearing took place just before FBI Agent Stukey's November 14 trial testimony, when the Government moved to prevent defense counsel from cross-examining Stukey about national security matters involved in the pre-August 1978 KH–11 investigation. To aid the district judge in his *in camera* review, the Government submitted an FBI file concerning that investigation. Thereafter, the court granted the Government's motion.

■ It is settled that *in camera ex parte* proceedings to evaluate bona fide Government claims regarding national security information are proper. *United States v. Brown*, 539 F.2d 467, 470 (5th Cir. 1976) (*per curiam*); *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977). Given the subject matter of this case, the district judge was warranted in using that procedure. Our study of both November hearing transcripts and the material supplied to Judge McNagny on November 14 has convinced us that the information defendant sought was highly sensitive and thus a proper subject of a protective order. No competing policy favoring disclosure was present, for our review of the information withheld by the trial judge disclosed no material that would have aided in the defense of Kampiles. The file contains no reference to Kampiles until August 1978 and substantiates the Government's contention that the defendant was not involved in the KH–11 investigation until that time. The brief references to him in August 1978 memoranda also contain nothing that would support his defense. Since the information was not exculpatory, the defendant could not have been prejudiced by its non-disclosure and the limits set on his counsel's cross-examination. Consequently his objection to the *in camera ex parte* proceedings and subsequent rulings must fail.

## C. Government's Late Production of Requested Evidence

■ On October 20, defendant filed a motion for disclosure of favorable evidence. On November 6, just before the commencement of defendant's trial, the Government provided defendant with an inventory of missing KH–11 documents, an inventory specifically requested by the defendant. All parties agree that defendant was entitled to such evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Defendant argues, however, that developments since *Brady* entitled him not only to receive the favorable information but to receive it "far enough in advance of trial to allow him sufficient time for its evaluation, preparation, and presentation at trial." *United States v. Partin*, 320 F.Supp. 275, 285 (E.D.La.1970).

We have recently stated that in reviewing the circumstances surrounding disclo-

---

**20.** Joannides testified that he inadvertently failed to forward defendant's letter about his Athens experience with the Soviet agent to the appropriate CIA employees until late July 1978.

sure, a court must consider "whether the disclosure came so late as to prevent the defendant from receiving a fair trial." *United States v. McPartlin*, 595 F.2d 1321, 1346 (7th Cir. 1979). The timing of disclosure here did not violate accepted standards of fairness. The *McPartlin* court found no due process violation even though there the Government failed to provide the requested information until after the start of trial and offered no explanation of its dilatoriness. Here, by contrast, the Government has pointed out that the inventory had not been completed as of October 31 and that defense counsel was kept apprised of its progress. In addition, defendant received the inventory before the trial, had an opportunity to use it, and even offered it into evidence. Since defendant has not provided any specific evidence of how the late disclosure caused him any prejudice, there was no violation of *Brady* and its progeny. *United States v. McPartlin, supra; United States v. Stone*, 471 F.2d 170, 173–174 (7th Cir. 1972), certiorari denied, 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391.

The judgment of conviction is affirmed.