UNITED STATES of America,
Plaintiff–Appellee,

v.

Wanda FIGUEROA, Defendant–
Appellant.

No. 93–1687.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1993.

Decided Feb. 3, 1994.

Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Gregory T. Mitchell (argued), Office of the U.S. Atty., Chicago, IL, for plaintiff-appellee.

Frederick F. Cohn (argued), Chicago, IL, Julius L. Echeles, Chicago, IL, for defendant-appellant.

Before POSNER, Chief Judge, and FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

After a two-day trial, Wanda Figueroa was convicted by a jury of embezzling almost $65,000 from her employer, the First National Bank of Chicago. At trial, her appointed attorney did not try to prevent—indeed, he invited—testimony revealing that she had failed a lie detector test administered by federal agents investigating the disappearance of monies from the bank. On appeal, Figueroa argues (as she may, *see United States v. Castillo*, 965 F.2d 238, 243 (7th Cir.1992); *United States v. Taglia*, 922 F.2d 413, 417 (7th Cir.1991)) that the pursuit of this tactic constituted ineffective assistance of counsel mandating a reversal of her conviction. Our task is "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the trial" while indulging the "strong presumption that ... the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) (internal quotation omitted). After carefully reviewing the record (to which, of course, our inquiry is confined), we conclude that the decisions made by Figueroa's counsel were not, under the circumstances of this case as they unfolded, outside "the wide range of reasonable professional assistance," *id.*, which we may not second-guess.

Wanda Figueroa was a teller at the Evanston, Illinois branch of First National. On July 12 and September 12, 1991, large sums of cash disappeared from the bank's main vault. Evidence linking Figueroa to the

missing funds initially was not strong. Yet certain aspects of her behavior did arouse suspicions. For example, Figueroa left work early on July 12, claiming that she needed to go to the hospital because her baby was sick; and a large check which Figueroa supposedly (according to bank records) received and cashed on September 12, while assisting a trainee at the drive-up teller position, could not be (and never was) found. (Four days after the latter incident, Figueroa was fired.) However, no one ever saw Figueroa take any money, investigators could not trace the missing funds to her, and other employees also had access to the vault on the days in question.

The FBI agent investigating the July incident, Special Agent Kevin Deery, interviewed Figueroa in September. She described her activities on the day in question and denied wrongdoing. Not long after this encounter, Agent Deery tried to recontact Figueroa to discuss the later episode at the bank but was unsuccessful, apparently because she had recently left town on her way to California and Mexico. By January, 1992, however, Figueroa had returned to Chicago and learned from her parents that the agent was looking for her. Figueroa called the agent and, at his suggestion, agreed to submit to a polygraph examination.

As arranged, Figueroa appeared at the FBI office on January 17. After she was advised of her *Miranda* rights and her right not to take the polygraph test and after she signed separate consents to be interviewed and to be administered the exam, Figueroa was interviewed and tested by Special Agent Michael Hanna, a polygraph specialist. In the course of the examination, Agent Hanna

queried Figueroa about the July and September shortfalls at the bank and concluded that her disavowals of involvement were untruthful. According to Agent Hanna, when he then confronted Figueroa with her poor performance on the test and urged her to come clean, she confessed in detail to taking money from the bank on each occasion. Agent Hanna then called Agent Deery into the room, and, according to both men, Figueroa repeated her confession. The only recordation of her confessions was a contemporaneous written report prepared by Agent Hanna and not signed by Figueroa.[1] In September, 1992, Figueroa was indicted on two counts of embezzling money entrusted to a federally insured bank. *See* 18 U.S.C. § 656.

Enter Sheldon Nagelberg, appointed by the district court on October 8 to represent Figueroa. Faced with a trial date originally set for November 23 and a government case relying mainly on Agents Deery's and Hanna's accounts of Figueroa's confessions, Nagelberg needed to develop relatively rapidly a strategy for defusing the evidentiary impact of the confessions at trial.[2] His options were rather limited. He could deny that they ever took place, effectively accusing two FBI agents of deliberate falsification; he could claim they were garbled and inconclusive, despite the clear acknowledgment of guilt and detailed descriptions of the incidents recorded and sure to be recounted at trial by the agents; or, he could argue that they were involuntary and thus unreliable. The alternatives dubious, Nagelberg chose to pursue a voluntariness/coercion theory.

Nagelberg apparently planned to rely on Figueroa's testimony at trial and a perceived

[1]. At Figueroa's trial, both agents testified as to the substance of her oral confessions. The report, of course, is inadmissible but could be—and was—used to refresh Agent Hanna's recollection. As related by the agents, Figueroa admitted taking $49,800 on July 12 by stuffing hundred dollar bills from the vault into her purse when an accompanying co-worker momentarily looked away. She said that in order to quickly spirit the money out of the bank she then told her supervisor that she had just received a call that her baby was sick and was being taken to the emergency room. (She told the agents that her son really was sick that day but that the call was a fabrication. In her September interview with Agent

Deery, Figueroa had recounted as true the same phone call story which she told her supervisor.) Figueroa also told the agents that she took $15,000 on September 12 and falsified two transactions to cover her tracks. She stated that she used the stolen cash to pay for trips to visit her husband's family in Mexico and to help them with bills and house construction costs.

[2]. No one doubted that the agents would be allowed to testify about the content of Figueroa's oral confessions. *See* Fed.R.Evid. 801(d)(2) (statement of party opponent).

inconsistency between Figueroa's confession—in which she may have implied that the claimed hospitalization of her son on July 12 was a ruse and untrue, *see infra* note 2—and hospital records—which show her child was admitted, treated and released to her on that day—to support the contention that she was coerced by the FBI into saying untrue things.[3] Hoping that an independent assessment of the circumstances surrounding the polygraph exam and subsequent confession would buttress this theory, on October 19 Nagelberg requested that the court appoint a polygraph expert to examine the procedures employed at the January 17 session. To that end, Nagelberg also made a motion to preserve the agents' handwritten notes from that day.

After his request for polygraph expert assistance was denied, Nagelberg evidently felt that the defense would be best served if no references to the failed exam were made at trial and coercion were established through his client's version of the confession, the purported conflict between the confession and Figueroa's actions as evidenced by the hospital records,[4] and cross-examination of the agents. Thus, he made a motion requesting that all mention of the polygraph examination and its results be barred at trial. The district court granted the motion with respect to the government's case-in-chief but, significantly, reserved ruling on admissibility of the polygraph evidence in the government's rebuttal case, citing *United States v. Kampiles,* 609 F.2d 1233 (7th Cir.), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1979). In *Kampiles,* this court held that when a confession is preceded by a failed polygraph examination and the confession is challenged as coerced, the polygraph evidence may be admitted to show the circumstances surrounding the confession and rebut the charge of coercion. *See id.* at 1244. (More precisely, evidence that the defendant was *informed* of the failure before confessing is admissible.)

This ruling, made four weeks before the commencement of trial, set the stage for Nagelberg's next (and, for present purposes, critical) adjustment in trial strategy. Presented with the inevitability that Figueroa's polygraph failure would be brought to the jury's attention,[5] Nagelberg decided to incor-

---

**3.** Figueroa claims that it was ineffective assistance for Nagelberg to adopt this course without making a pretrial motion to suppress. While failure to make a critical motion sometimes will give rise to such a claim, *see Rodriguez v. Young,* 906 F.2d 1153, 1160–61 (7th Cir.1990), *cert. denied,* 498 U.S. 1035, 111 S.Ct. 698, 112 L.Ed.2d 688 (1991), when, as here, there is a dearth of hard evidence supporting the motion to suppress, a trial attorney reasonably may make the tactical decision not to risk bothering the trial judge with a probably futile motion, *see United States v. Grizales,* 859 F.2d 442, 447 (7th Cir.1988), choosing instead to argue the unreliability of the evidence to the jury. Plainly, an argument may be appealing enough to give rise to a reasonable doubt in a jury's eyes but be clearly inadequate to persuade a judge by a preponderance of the evidence at motion time. Also, an argument, dubious at its inception, may gain strength in light of testimony elicited on cross-examination at trial. In this case, there simply was not enough support for the theory of coercion in advance of trial to obligate Nagelberg to make a suppression motion on that ground. "Attorneys need not pursue every conceivable avenue; they are entitled to be selective." *United States v. Davenport,* 986 F.2d 1047, 1049 (7th Cir.1993). But neither was that theory so outlandish, especially in light of the inferior alternatives realistically available, that his decision to embrace it

over the long haul was unreasonable (nor does Figueroa now contend it was).

**4.** We say purported because we see no necessary discrepancy between Figueroa's claim in her confession that the phone call about her baby was made up and her documented trips to the hospital. The records show that she brought the baby to the hospital early in the morning before she arrived at work and that the child was not released until several hours after Figueroa departed the bank later that morning. Indeed, the story which Figueroa claimed was false in her confessions—namely, that she received a call summoning her to *take* a sick child to the hospital—does seem dubious in light of the fact that the child was already at the hospital because *she* dropped it there on the way to work.

**5.** Actually, it was inevitable only to the extent that Nagelberg did not choose to abandon his plan to attack the voluntariness of Figueroa's confession. Was it ineffective assistance for him to continue on this course? Under the circumstances faced by Nagelberg, no. First of all, the court's ruling was not one Nagelberg should have predicted from the start. *Kampiles* merely sustained a district court's decision to allow limited use of polygraph evidence to rebut a charge of coercion; it did not mandate similar uses in all cases. The outcome of the discretionary bal-

porate the polygraph evidence into his case-in-chief and somehow try to use it to bolster the claim that Figueroa's confessions were unreliable. The government, actually *fearing* that he would do so,[6] filed a motion *in limine* on the eve of trial requesting that Figueroa be barred from using the polygraph evidence in his case-in-chief. When the district court intimated that if Nagelberg planned to refer to Figueroa's awareness of having failed the polygraph the government could discuss the same in its main case,

Nagelberg stuck with his revised plan to use the polygraph evidence offensively and orally withdrew his original motion to the extent it barred government reference to Figueroa's knowledge that she failed the exam.[7] As a result, the government in its opening statement disclosed that Figueroa was asked to take a polygraph exam and confessed after the examiner said "I believe you are lying to me." In his opening, after suggesting that the FBI agents had preconceived beliefs as to Figueroa's guilt, Nagelberg told the jury

ance of prejudice and probativeness varies from judge to judge and from case to case. Thus, it was not until the district court elected to actually do what *Kampiles* permits that Nagelberg was really confronted with the choice between allowing mention of the polygraph and abandoning the coercion theory. More fundamentally, Nagelberg did not have any truly exculpatory evidence that could adequately offset the likely devastating effect twin accounts of his client's detailed confession would have. The one (probably phantom) inconsistency in the confession, even if left unexplained by the government, could hardly be the backbone of a persuasive defense. The access other bank employees had to the vault and the unexceptional nature of teller errors—subjects in fact explored by Nagelberg at trial—while consistent with a claim of innocence do not constitute a theory of the case. Similarly, the lack of evidence showing an increase in Figueroa's material wealth was of limited value since in her confessions Figueroa herself explained this gap in the proof. Nagelberg was between the devil of refraining from attack on a confession crucial to the government's case and the deep blue sea of licensing government reference to the polygraph exam before the jury. His ultimate decision under such circumstances was a tactical one, *see Kampiles*, 609 F.2d at 1243, that we are not in a position to declare unreasonable.

6. The government felt that the jury might incorrectly suspect it of concealment if the defense were to have made first mention of the polygraph exam.

7. The colloquy with the court during recess between impanelment and opening arguments reveals Nagelberg's options and thought process:

> THE COURT: Nobody is mentioning any lie detector, right?
>
> MR. NAGELBERG: Judge, we need to address that issue. That was my motion in limine. I need to discuss with you that issue.
>
> THE COURT: Well, do you intend to mention the lie detector in your opening?
>
> MR. NAGELBERG: Yes, I do, and if I can explain why. I did mention to Mr. King [the prosecutor] a couple of weeks ago, during Christmas vacation, that I may shift gears.

> THE COURT: Why was the motion just filed? This has been pending a long time.
>
> MR. NAGELBERG: May I explain? I just received this [apparently the government's motion] over the fax yesterday, late in the afternoon.
>
> Judge, this is a confession case. This case will rise and fall in the confession of Wanda Figueroa. To my knowledge, there is no smoking gun. There is no showing of any change of material wealth.
>
> (sidebar interrupted)
>
> \* \* \* \* \* \*
>
> MR. NAGELBERG: Right after Ms. Figueroa was told that she failed the lie detector test, the 302 [FBI report] says that she made a confession to Special Agent Michael Hanna. After she made the confession to Special Agent Michael, she then made the identical confession to the case agent, Kevin Deery.
>
> My client says that a form of coercion, verbal coercion did occur with Special Agent Michael Hanna. My burden in this case, frankly—
>
> THE COURT: Well, that kind of nullifies your motion in limine against the government. Are you withdrawing that?
>
> MR. NAGELBERG: That's correct.
>
> THE COURT: All right, then. All bets are off.
>
> MR. KING: We can bring in any issue, as to the question of polygraph, on appeal.
>
> MR. NAGELBERG: The Kampiles case, which you cited, is controlling. And I think those are the rules of the game stated in Kampiles.
>
> The thing that will be brought out is that my client was told that she failed the lie detector test. I have, on more than one occasion, requested some type of expert to go into the reliability of that testing, and that has been denied by the Court. I am asking that the evidence regarding the lie detector test penetrate only insofar as the fact that she was told she failed the test, not into any reliability.
>
> THE COURT: Can you live with that?
>
> MR. KING: I can live with that. I would just ask leave to ask for a moment. I specifically warned everybody not to say anything about it.
>
> THE COURT: All right.

that Figueroa confessed only after she was told that she failed a polygraph test, to which she had originally agreed to submit in the expectation of clearing her name. He went on to indicate that Figueroa would testify as to how she felt further pressure to confess by unfair and intimidating verbal tactics used by the interviewing agent, including a suggestion that she could avoid separation from her child by admitting guilt.

Looking at Nagelberg's gambit and the circumstances under which it was made, we can only conclude that it was a valid tactical maneuver. Mounting an assault on the government's prime piece of evidence meant the jury was eventually going to find out, one way or another, that before she confessed, Figueroa was told that she failed a polygraph examination. The district court made this much quite clear by its citation to *Kampiles* and comments in open court. It undoubtedly was reasonable lawyering for Nagelberg to attempt to deflate the impact of this information by putting his spin on it as early as possible in the course of the trial. Expecting his client to testify about the coercive nature of the confession-inducing interview, Nagelberg plausibly sought to portray her as initially weakened and made susceptible to the government's pressuring practices by her belief that the government and its imposing machine were already disposed against her. Nagelberg, previously denied expert assistance to challenge polygraph reliability, cabined the collateral prejudice caused by the unavoidable polygraph references in the only

way he could. He made sure that witnesses would only testify that Figueroa was told that she failed and not directly that she did in fact fail, and he obtained a special instruction specifically charging the jury not to consider the reported polygraph failure in determining the truthfulness of Figueroa's confessions.[8] Admittedly, it is especially hard to put this type of genie back into the bottle, but from Nagelberg's perspective, the genie was going to make her way out anyway. By trying to have some say in the terms of her departure, Nagelberg did not act unreasonably.

That events at trial did not unfold as favorably as hoped does not retroactively transmute legitimate strategy into ineffective assistance. After the agents testified about the events of January 17, including how Figueroa was told that she failed the polygraph test, Nagelberg cross-examined them vigorously but without spectacular success. Although he managed to elicit some helpful testimony during the trial—for example, that practices at the bank for keeping track of cash were lax—, Nagelberg was unable to make good on his assurance to the jury that they would hear testimony showing that the confession was made under coercive circumstances. This blow to the defense was largely a result of an unexpected decision midway through trial that Figueroa would not testify in her own defense as originally planned. Apparently experiencing trepidations about taking the witness stand, Figueroa made up her mind not to testify.[9] The defense had to rest

---

**8.** Now, for the first time, Figueroa argues that the instruction was inadequate because it did not explain to the jury directly that the accounts of her failure of the polygraph exam should not be regarded as evidence of guilt. But in this case, where the confessions were the authoritative version of the crime argued to the jury, instructing that the polygraph results could not bear on their truthfulness conveyed the same message. There was no plain error in the set of instructions given.

**9.** After Nagelberg rested his case, this exchange took place at sidebar:

> THE COURT: You represented to me that the defendant was going to testify.
> MR. NAGELBERG: Yes I did. Yesterday, after that, I was speaking to the defendant and she expressed her fears that she did not wish to testify.

> THE COURT: I want you to understand that it is your own personal right to decide whether or not you wish to testify. Nobody else can make that decision for you. Of course, you have the right to consult your attorney and he can tell you the pros and cons, including the fact that the government will have the right to cross-examine you if you testify, but I want you to understand it is your right, only yours.
> Have you had time to think about it?
> DEFENDANT FIGUEROA: Yes, I have.
> THE COURT: What do you wish to do?
> DEFENDANT FIGUEROA: I don't want to testify.

At sentencing, Nagelberg explained that this decision was prompted by Figueroa's "great nervousness."

without presenting Figueroa's first-hand claim of coercion to the jury.[10]

 The upshot of this was that the jury heard how Figueroa was administered a polygraph test and that she failed without ever being told—apart from never-substantiated allegations in the defense's opening and insinuating questions on cross-examination—a coherent story about coercion. Thus, in hindsight, Nagelberg's strategy completely backfired. But a retrospective vista is precisely the wrong perspective from which to determine whether a criminal defendant received effective assistance. We evaluate an attorney's actions as if we were sitting alongside him at counsel's table at each moment a challenged decision was made. And, as the above summary of the litigation makes clear, a contemporaneous assessment of Nagelberg's conduct of Figueroa's defense based solely on the trial record (and thus assuming reasonableness whenever possible, *see Bond v. United States*, 1 F.3d 631, 635 (7th Cir. 1993)), indicates that it met the constitutional minimum for competency.[11]

In sum; to attack the confession, Nagelberg acquiesced to some polygraph testimony; to minimize the damage, he planned to use the testimony offensively; to receive court approval for the plan, he assented to earlier government use of the testimony; and to quell his client's unanticipated agitation, he discarded the plan. On the record before us, each decision was, though not indisputable, objectively reasonable at the time it was made.

AFFIRMED

---

10. In his closing, Nagelberg argued extensively that the agents' result-orientation skewed the investigation, that the evidence was circumstantial, unpersuasive and inconsistent with guilt, and that the confession was inaccurate in part and thus unreliable in whole. However, he made no mention of the polygraph exam—no attempt to explain Figueroa's failure or incorporate it into a coercion argument.

Omitting discussion of the polygraph was probably a tactical decision and in our opinion a reasonable one to make one day after the planned examination of Figueroa had to be shelved. With the foundation of his coercion theory left unlaid, Nagelberg could have reasonably made an assessment that more harm than good would have flowed from further reminding the jury of the polygraph test and Figueroa's disappointing performance.

11. Indeed, one contemporaneous observer to all of Nagelberg's critical decisions in this case, the trial judge, said this to Figueroa:

I think you were well represented at trial. And I think Mr. Nagelberg certainly elicited from the witnesses very sympathetic information that the jury considered concerning you and your child and his illness. He went into that in some detail. And it is beyond my comprehension how anyone could have done more for you than Mr. Nagelberg did.