**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Nathaniel BROWN and Willie King, Defendants–Appellants.**

**Nos. 94–3504, 94–3556.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 6, 1995.

Decided Dec. 15, 1995.

---

Barry Rand Elden, Chief of Appeals, William D. Shaver (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for U.S.

Joseph A. Ettinger, Chicago, IL, Anthony M. Petrone (argued), Chicago, IL, for Nathaniel Brown.

Andrew M. Cohen (argued), Arnold & Alexander, Chicago, IL, for Willie King.

Before CUMMINGS, ROVNER, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Nathaniel Brown, Willie King, and their associates were, for a period of time, in the truck leasing business. Theirs was no ordinary business, however, because the tractors and trailers that they leased to their customers were vehicles that had been stolen, furnished with new, fraudulent Vehicle Identification Numbers (VIN), re-titled, and re-tagged. After a jury trial, Brown was convicted on one count of conspiring to receive and possess stolen semi-tractors and trailers that had traveled interstate, and conspiring to remove, obliterate, and alter their VIN, in violation of 18 U.S.C. § 371. The jury convicted King on the same conspiracy charges, and in addition it found King guilty of offenses relating to the receipt and possession of the stolen vehicles in violation of 18 U.S.C. §§ 2313 and 2315. Before this court, both defendants raise claims about the sufficiency of the evidence to support the jury's verdict. Brown also complains about his sentencing, and King asserts that he received ineffective assistance of counsel and that the district judge should have barred certain testimony. Because we find that the evidence adequately supports the verdicts, and that the district court did not otherwise err, we affirm both convictions and Brown's sentence.

## I.

When the question on appeal is the sufficiency of the evidence to support a criminal conviction, we must uphold the jury's verdict if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Saadeh,* 61 F.3d 510, 525 (7th Cir. 1995); *United States v. Pulido,* 69 F.3d 192 (7th Cir.1995). From that perspective, the following story of a sophisticated enterprise to receive and take advantage of valuable stolen tractors and trailers emerges.

### A. The Stolen and Re-tagged Vehicles

The prosecution focussed on four specific stolen vehicles: a 1988 Utility Trailer, a 1989

Peterbilt Tractor, a 1987 Western Star Tractor, and a 1984 Fruehauf Trailer. In each case, as we detail below, other individuals actually stole the vehicles. King and Brown worked together to sanitize the relevant documentation and to create an income stream through leasing.

In April 1989, truck thief Michael Pagano stole a 1988 Utility Trailer from a trucking company in Grand Rapids, Michigan. Following an earlier agreement, Pagano then drove it to Chicago and sold it to a Mr. Arthur Veal (originally a co-defendant of Brown and King, who entered a guilty plea to the conspiracy charge before the trial started) for $2,500, well below its estimated value of $42,000. Some time later, the 1988 Utility's VIN was removed and replaced with the VIN tags from a 1982 Utility Trailer, which Veal had recently purchased in wrecked condition. On May 10, 1989, Veal sold the re-identified Utility to King for $8,000. A representative of Country Supply, Inc., which was financing King's purchase, examined the vehicle and pronounced that it was in "pristine condition." (Individuals in the trucking business can tell by looking at a VIN when a vehicle was manufactured. Witness Richard Elliott, from the Cincinnati dealership Kerry Ford, testified that the eighth character from the right indicated year, with A designating 1980, B 1981, and so on.) King then obtained a vehicle identification card for the Utility. Brown's involvement with this vehicle appears to have been limited to the leasing arrangement, described below.

Next, Pagano stole a 1989 Peterbilt Tractor from a Grand Rapids, Michigan, truck dealership, drove it to Chicago, and sold the $80,000 vehicle to Veal for $4,000. As before, the legitimate VIN was removed and replaced, in this instance with a wholly fictitious number—"obviously hand-stamped," according to one of the government's witnesses. The VIN affixed to the 1989 Peterbilt matched the VIN on a title that King had obtained through Linda Croom, a clerk-typist with the Indiana License Bureau who helped him create a fraudulent Indiana title in the name of Robert Macklin for an imaginary 1987 Peterbilt.

The title that was found in the Peterbilt when it was recovered by police showed Nathaniel Brown as Macklin's transferee. The Peterbilt also contained an Illinois apportionment card and plates in Brown's name, which had been issued through the AABLE Licensing Consultants in Westchester, Illinois. The jury had conflicting testimony before it on the question whether Brown personally applied for the apportionment cards and plates at AABLE. AABLE's owner, Sharon Leiss, testified that she assumed that Brown had applied personally for the documentation, because the individual in front of her had displayed three documents showing Nathaniel Brown's name: an Illinois voter's card, an Illinois Bell telephone bill, and an Illinois driver's license (which, we note from the exhibits admitted in the district court, was a photo ID). She had no personal recollection of seeing Brown at her agency, some four years before the trial. No one disputed the existence or nature of the documents, because copies remained in AABLE's files, and Brown had the opportunity to examine them when the copies were admitted as Government Exhibit 64B at trial. At no time did Brown dispute that the documents were genuine; instead, he commented that if AABLE had his identification documents, it must have been because he had given them to King to use.

Following the same pattern, Pagano absconded with a 1987 Western Star Tractor from a Ford dealership in Wyoming, Michigan and sold it to Veal the next day in Chicago. Again, the VIN was removed and replaced with a fake number. Veal then transferred the tractor to King, who arranged to have the title sanitized through the Indiana License Bureau, again with Croom's help. This title too eventually showed a transfer to Brown.

Although the details differ for the last vehicle, the theme is by now familiar: unknown thieves stole a 1984 Fruehauf Trailer from a trucking company yard in South Holland, Illinois, in July 1987; the VIN was obliterated and replaced with a false number; fraudulent title documents (this time from West Virginia) were prepared showing Brown as the owner, and the title reflected a

lien that actually corresponded to a different vehicle owned by Veal.

## B. The Leasing Business

In 1989, King approached Brown and proposed that the two start a trucking firm. Brown agreed to set up a company called Vision Transportation and to handle the finances of the company. Brown accordingly opened a checking account at South Chicago Savings Bank. Brown also received, at his home, the apportionment plates for the Peterbilt and the Western Star. He acknowledged that both showed him as the owner of the vehicle in question, and he admitted knowing generally that the vehicles were expensive (although he denied knowledge of their precise value). There was no record that Brown ever made any payment for the vehicles.

With everything in place, Brown and King then set out to obtain leases for their new "inventory." Their first customer was MTI Trucking, a steel hauling company. King introduced Brown to Joanne Geib, a terminal manager for MTI. On March 21, 1989, Geib, on behalf of MTI, signed a lease with Brown for a 1987 Western Star tractor. Brown presented a copy of the Illinois apportionment plate card as proof of his ownership. Brown's name clearly appears on the lease; however, Geib was unable to identify Brown in the courtroom, and Brown himself denied that the signature was his. On June 16, 1989, MTI entered into a second lease, this time for a 1987 Peterbilt. Again, Brown offered an Illinois apportionment plate card in his name as proof of ownership.

Vision Transportation's second customer was Tracy Transport. Between October 1989 and December 1989, Tracy signed two leases with Brown for the Peterbilt and Western Star tractors. Again, King brought the parties together, telling Tracy's president that he had a friend (Brown) who owned several trucks and wanted to rent them out. In this instance, King provided the Illinois apportionment plates to Tracy representatives, to prove Brown's ownership. King apparently handled the negotiations, but Brown signed at least one lease.

Both sets of leases produced some income, and in each instance Vision Transportation appears to have used the stolen trailers with the stolen tractors. Under the MTI lease, MTI paid Brown weekly: between April 1989 and September 1989, it issued 29 checks to Brown totaling approximately $41,000. Brown cashed or deposited each one in the South Chicago Savings account, under the name "Nathaniel Brown d/b/a Vision Transportation." Tracy Transport issued five checks, totaling about $8,000, payable to Brown. They gave the checks directly to King, who passed them along to Brown to cash or deposit in the company account.

## C. Detection

In late November 1989, the Illinois State Police responded to a report of an abandoned semi-trailer in Hinsdale, Illinois. They discovered the 1988 Utility, and noted that its true VIN plate had been removed and a false plate attached in its place. With the assistance of other law enforcement officials, they then maintained surveillance on the Utility, until in early December 1989 a driver for Tracy Transportation picked up the Utility using a Peterbilt tractor. The police followed the driver, and upon arriving at Tracy's yard, they learned that Tracy had been leasing the Utility, the Peterbilt, the Western Star, and the Fruehauf from Brown and King. Upon further inspection, they discovered that the VINs had been obliterated. Brown, King, and Veal were later arrested.

## II.

On May 4, 1994, the grand jury returned a five-count indictment charging Brown and King with (1) conspiring to receive and possess stolen semi-tractors and trailers which had traveled interstate, and conspiring to remove, obliterate, and alter vehicle identification numbers of motor vehicles, in violation of 18 U.S.C. § 371; (2) receiving and possessing stolen semi-tractors which had traveled interstate after they were stolen, in violation of 18 U.S.C. § 2313 (Counts Four and Five); and (3) receiving and possessing stolen semi-trailers valued over $5,000 which had traveled interstate after they were stolen, in violation of 18 U.S.C. § 2315 (Counts

Two and Three, which both related to the Utility, but indicated different dates—Count Two named only Veal and King, and Count Three named only Brown and King).

At the trial, the district court dismissed Count Two as duplicative. At the close of the government's case, and again at the close of all the evidence, both Brown and King moved for judgment of acquittal. The court denied the motions both times. On July 14, 1994, the jury returned a verdict finding Brown guilty on Count One only, and King guilty as charged. After the district court denied King's motion for new trial and Brown's renewed motion for judgment of acquittal, it sentenced King to 33 months imprisonment and three years supervised release, and Brown to 27 months imprisonment and two years supervised release. Both defendants then appealed.

### III.

#### A. Count One: Conspiracy Convictions

██ In order to convict under 18 U.S.C. § 371, the government must prove (1) an agreement to accomplish an illegal objective against the United States, (2) one or more overt acts in furtherance of the illegal purpose, and (3) the intent to commit the crime. *United States v. Humphrey,* 34 F.3d 551, 555 (7th Cir.1994). Because most criminals take pains to keep their conspiracies secret, circumstantial evidence is both permissible and frequently used to prove the existence of a conspiracy and the participation of its various members. *United States v. Donovan,* 24 F.3d 908, 913 (7th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994). Here, this means that the government had to prove that Brown and King entered into an agreement to possess the stolen semi-tractors and trailers that had traveled in interstate commerce, that either one of them committed an overt act in furtherance of the conspiracy, and that each one intended to join it.

In the final analysis, the outcome of this case rests on the intent element. Neither Brown nor King seriously argues that they did not have an agreement to possess the vehicles in question, or that they did not take affirmative steps in furtherance of that agreement. To the contrary, they concede that they set up Vision Transportation for the express purpose of possessing and leasing out these particular vehicles. The leases with MTI Trucking and Tracy Transport, the bank account at South Chicago Savings, and the steps taken to obtain Illinois apportionment cards for those particular vehicles all provide ample support for the first two elements of the offense. Both defendants, however, urge us to find that the government failed to present sufficient evidence to permit the jury to find that they had the necessary criminal intent. They insist that the record contains no evidence that is inconsistent with the hypothesis that they were innocent dupes, who had no reason to believe that the trucks they received were anything but legitimate. This gap, each one argues, requires us to reverse his conviction. We address Brown's case first, and then King's.

The circumstantial evidence that the jury heard that tended to show Brown's awareness that this was an illegal scheme to possess the stolen vehicles, construed in the light most favorable to the verdict, is enough to support his conviction. Without implying that we have identified everything, we note the following points. First, Brown conceded that he knew that the vehicles to be handled by Vision Transportation were valuable and that he was to be shown as the owner of those vehicles on documents like the Illinois apportionment cards. He admitted receiving the apportionment cards at his home. The jury may have found it incredible that King and his associates were simply giving Brown such valuable assets, no questions asked, in exchange only for Brown's act of opening up a bank account, signing some leases, and paying a few drivers. (Indeed, Brown has a problem here. He tries to argue that his participation in the venture was extremely limited, but the more limited it was, the odder it may have seemed to the jury that someone would turn over expensive semi-trailers and tractors to him.)

In addition, Brown was involved in the acts of obtaining the fraudulent documentation for some of the vehicles. The titles showed that Brown received the Peterbilt from a Robert

Macklin, the Western Star from a William Bennett, and the Fruehauf from someone in West Virginia. Yet Brown testified that when he handled the titles showing these names, he knew that he had never met Macklin or Bennett, and he had never been to West Virginia. The jury was entitled to disbelieve his protestations of ignorance, and to conclude instead that he knew that the titles were not genuine. No money appears to have changed hands; he did not know the people; he performed no services for them— in short, the jury heard nothing that might have legitimated these transactions.

Brown clearly participated in the dealings at AABLE Licensing Consultants that resulted in the issuance of Illinois apportionment plates in his name. He argues that it is highly significant that Sharon Leiss, the president of AABLE, had no recollection at the time of the trial in 1994 of meeting him in mid–1989. But this fact does not bear the weight Brown tries to put on it. Leiss testified that she assumed Brown had appeared in person, because her business records contained the three pieces of identification from the applicant noted above, which included Brown's Illinois driver's license. Brown himself, upon viewing the AABLE file in this case, did not deny that the license or other documents were his. Instead, as we noted earlier, he said only that he assumed he must have given them to King, and that he must have had a good reason to do so. Knowing what appeared in the AABLE business records, the jury could have concluded that Brown was lying, and that he did in fact go personally to AABLE to obtain the plates. Alternatively, the jury could have concluded that Brown cooperated with King to obtain the plates by loaning King his identification papers. Either way, Brown certainly knew that the transaction had occurred, because he received the plates themselves at his home. And either way, the jury had evidence before it that Brown was intentionally involved in the illegal re-tagging scheme.

The government also notes that Brown's name appears on the Vision Transportation leases and that he handled Vision's finances. These facts, standing alone, are more pertinent to the existence of the agreement to possess the vehicles and the overt acts than they are to Brown's intent. The financial dealings, however, demonstrate beyond any doubt that Brown knew he possessed valuable assets, which, as he admitted explicitly during his direct examination, he did not purchase.

We do not dispute Brown's contention that the record contained other evidence that might have shown that he was (in the government's words) an unwitting accomplice in this conspiracy. But we cannot reweigh the evidence and decide whom the jury should have believed and disbelieved. It is enough, as we have found, that there was evidence to support the jury's conclusion that Brown knew that he was involved in a scheme to possess stolen and fraudulently titled vehicles, as well as evidence to support the other elements of the conspiracy.

■ The case against King is also well supported by the evidence before the jury. King's participation in the procurement of the false titles was clear. He was the person who made contact with Linda Croom, the Indiana Licensing Bureau contact. Croom testified that King secured, with her help, the title eventually etched into the Peterbilt long before Pagano had even stolen it. Croom also testified that King, again with her help, used a forged Ohio title to obtain a fraudulent Indiana title for the Western Star. King initiated the discussions with Brown about setting up Vision Transportation, and Brown himself testified that King negotiated and signed the leases. Geib, the person at MTI responsible for the lease with Vision Transportation, testified that King introduced Brown to her. Finally, Pagano's testimony showed that King was Veal's Chicago contact for receipt of the stolen vehicles. This was more than enough to support the jury's conviction of King on the conspiracy count.

**B.  Counts Three, Four, and Five: Possession Convictions**

■ Only King was convicted of Counts Three, Four, and Five, the remaining substantive counts of the indictment. Count Three charged a violation of 18 U.S.C. § 2315 with respect to the Utility trailer.

Counts Four and Five charged violations of 18 U.S.C. § 2313, for the Peterbilt and the Western Star respectively. To establish King's guilt on the charge under 18 U.S.C. § 2315, the government had to prove that (1) the vehicle in question was stolen, (2) the vehicle crossed a state line after it was stolen, (3) King received or possessed the vehicle after it was stolen and had crossed the state line, (4) King knew when he received or possessed the vehicle that it had been stolen, and (5) the value of the item (the Utility) was more than $5,000. 18 U.S.C. § 2315. To establish his guilt under 18 U.S.C. § 2313, the government had to prove only the first four of those elements. See *United States v. Mitchell*, 876 F.2d 1178, 1180 (5th Cir.1989).

The evidence amply supported all three convictions. The owners of each of the vehicles testified at trial about the thefts, and the thief himself (Pagano) told the jury how he did it. All three vehicles moved from Michigan to Illinois before coming into King's hands. King plainly received and took possession of all three, taking the steps described above to obtain title documents and to use them for the business of Vision Transportation. For the same reasons that support his conspiracy conviction, the jury could have concluded that he knew that each vehicle was stolen. Finally, the owner of the 1988 Utility testified that the trailer cost him $42,000, and the photographic evidence showed that it was in good condition, which certainly entitled the jury to conclude that it was worth at least $5,000 when stolen.

### C. King: Ineffective Counsel and Evidentiary Claims

■ Before we turn to Brown's sentencing arguments, King raises two more points that, he asserts, require at least a new trial. Both claims relate to the testimony of Ronald Wright. Wright had testified on direct examination that he ran a business named RAW Truck Licensing Service, which helps truckers to procure Illinois apportionment plates. In June 1988, King gave him an Indiana title showing William Bennett as the owner of a 1987 Western Star tractor. Wright then obtained plates for the vehicle for King. Those plates bore the fictitious

VIN number later found on the stolen tractor. Wright then went to King's house to collect his fee of $3,000 for this service. Upon arriving at the house, Wright was directed to King's bedroom, where King was lying in bed. When he asked for his money, King flung a "whole roll" across the bed at him, from which Wright took $3,000 in one-hundred dollar bill denominations.

On cross-examination, King's attorney, Mr. Nagelberg, explored the visit to the King home further. He first asked a series of questions about Wright's dealings with the FBI and other law enforcement officials, suggesting that Wright was trying to impress the agents through his testimony. Nagelberg asked whether Wright was trying to convey the impression that King lived in a very secure "fortress-type" home. Pursuing this line of thought, Nagelberg then asked whether Wright was trying to impress the agents and get them to believe that King was "some kind of gangster who lived in a secure home, protected by pit bull dogs and security fences and thick glass." Finally, Nagelberg asked whether Wright "mentioned to the [FBI] agent that [Wright] knew that Mr. King's sister was murdered several years ago when some other individuals tried to murder Mr. King and accidentally killed his sister." Wright said that he did not recall the conversation.

King argues both that his counsel rendered ineffective assistance, by personally introducing such unfavorable facts on cross-examination, and that it was plain error for the district court to admit Wright's testimony. Although we are generally reluctant to consider ineffective assistance claims that have not been presented to a district court for a full evidentiary hearing, King's lawyer assured us at oral argument that he wanted to raise the point at this time. We therefore consider the two points in turn.

Under *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984), a criminal defendant trying to show ineffective assistance of counsel must show both that his attorney's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's errors,

the result of the proceeding would have been different. See also *Burris v. Farley,* 51 F.3d 655, 662 (7th Cir.1995); *United States v. Kellum,* 42 F.3d 1087, 1094 (7th Cir.1994). In evaluating these claims, we look to the totality of the circumstances, with a strong presumption of reasonably effective assistance. *United States v. Reiswitz,* 941 F.2d 488, 495 (7th Cir.1991).

No matter what, trial counsel faced a difficult problem with Wright's testimony. If he had left it unchallenged, the jury would have heard strong evidence linking King to the conspiracy and to the Western Star substantive count. He needed, therefore, to find some way to undermine Wright's credibility. He opted to pursue a line of questioning that implied strongly that Wright was willing to say or do anything that would impress the FBI—including, presumably, testifying unfavorably to King at the trial. Although, knowing the result of the trial, one might say that this strategy had its own substantial risks, we do not require trial counsel to perform to the standards of 20–20 hindsight. See *United States v. Figueroa,* 15 F.3d 706, 711 (7th Cir.1994). We cannot say on this record that Mr. Nagelberg's performance was objectively unreasonable. Furthermore, even if he made an objectively bad judgment at this moment of the trial, the totality of the circumstances persuades us that any error he made was not something that probably affected the outcome of King's case.

■ Conceding that he made no contemporaneous objection to Wright's testimony (obviously, because of Nagelberg's role in eliciting some of it), King argues that it was plain error for the district court to admit it. Here, King has a heavy burden indeed. He must show that there was error, that it was plain, and that it affected his substantial rights. *United States v. Olano,* 507 U.S. 725, ——, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993); *United States v. Davis,* 15 F.3d 1393, 1407 (7th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 250, 130 L.Ed.2d 171 (1994). Even assuming that the district court should have cut off the exchange between Wright and Nagelberg on grounds of relevancy or prejudice, King cannot show that this alleged error affected his substantial rights. The trial as a whole brought forward substantial evidence of his guilt, and there is no reason to believe that the jury would have come to a different conclusion without this brief exchange. We decline to find that the district court plainly erred in permitting this testimony to go forward.

## IV.

Finally, Brown raises several challenges to the district court's application of the Sentencing Guidelines. Under 18 U.S.C. § 3742(e), when a party has properly appealed a sentence, this court must determine whether a sentence (1) was imposed in violation of law, (2) was imposed as a result of an incorrect application of the sentencing guidelines, (3) is outside of the applicable guideline range and is unreasonable, or (4) was imposed for an offense for which there is no guideline and is plainly unreasonable. The district court's findings of fact are entitled to deference under the clear error standard of review, *United States v. Hoggard,* 61 F.3d 540, 541 (7th Cir.1995); legal conclusions are reviewed *de novo.*

The district court found that Brown had a criminal history category of I, and a basic offense level of 16 (including a two level increase for more than minimal planning, under U.S.S.G. § 2B1.1). Finding that Brown's testimony that "he did not know that this was a fraudulent title transferred over in his name and that he merely signed it because Willie King told him to sign it is incredible and was incredible," the court granted a two-level enhancement pursuant to U.S.S.G. § 3C1.1, which brought the level to 18. The court denied Brown's requests for a two to four level decrease under U.S.S.G. § 3B1.2, as a minor or minimal participant, and it overruled his objection to the two-level enhancement for more than minimal planning.

■ Brown argues first that the court clearly erred when it denied any decrease in level for minor or minimal participation, under U.S.S.G. § 3B1.2. The court noted several reasons for its decision. First, it found that Brown was an educated man. Second, it stressed that Brown played a central role in

the conspiracy, particularly in its leasing aspects. Finally, it noted that approximately $45,000 in checks passed through his account as lease payments.

 There is nothing to suggest that these findings are clearly erroneous, or even that they were mistaken. Departures for minimal participants are supposed to be infrequent in any event, according to Application Note 2 to U.S.S.G. § 3B1.2. Minor participants are those who are less culpable than most other participants, but the district court's finding that Brown played a central role in the conspiracy rules out minor participant status for Brown as well. See *United States v. Kerr*, 13 F.3d 203, 206 (7th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1629, 128 L.Ed.2d 353 (1994) (appropriate to consider participant's level of culpability in making § 3B1.2 decision); *United States v. Burnett*, 66 F.3d 137, 140 (7th Cir.1995) (role in the offense pertinent to § 3B1.2).

 Brown argues that the two-level enhancement under § 3C1.1 for obstruction was erroneous both as a matter of fact and as a matter of law. On the latter point, he suggests that the government is attempting to use § 3C1.1 in circumstances where the defendant's testimony may be truthful, but still insufficient to prove lack of intent, citing *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), and *United States v. Rodriguez*, 995 F.2d 776, 778–79 (7th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 648, 126 L.Ed.2d 605 (1994). In fact, the government contends here that it met a higher standard, namely, that Brown simply lied. A sentencing court's determination that a defendant obstructed justice by testifying falsely is a finding of fact entitled to review under the clearly erroneous standard. *United States v. Carson*, 9 F.3d 576, 584 (7th Cir.1993), cert. denied, —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994). The district court here made such a finding, and our review of the entire record convinces us that she did not clearly err.

 Finally, we reject Brown's claim that the district court should not have enhanced his offense level by two for more than minimal planning under U.S.S.G. § 2B1.1(b)(5).

The degree of planning in which he engaged is a question of fact, which we again review deferentially. The court found that Brown had engaged in repetitive criminal acts over a period of time, and had entered into two separate lease agreements. It also found that his receipt of the lease payments indicated his control position and that he was involved in several different transactions involving both the lease and the licensing aspects of the conspiracy. These findings are fully supported by the record.

## V.

For the reasons stated, we **AFFIRM** the conviction and sentence of Nathaniel Brown, and we **AFFIRM** the conviction of Willie King.